DENNIS HUNT *v.* STATE OF INDIANA.

[No. 672S84. Filed May 16, 1973.]

*Richard C. Brunt,* of Indianapolis, for appellant.

*Theodore L. Sendak,* Attorney General, *Anthony J. Metz, III,* Deputy Attorney General.

HUNTER, J.—This is an appeal by Dennis Hunt, appellant (defendant below), from a conviction for First Degree Murder. Appellant was charged by indictment with the offense of killing a human being while in the commission of first degree arson, and entered a plea of not guilty. Trial was to a jury which returned a verdict of guilty, and appellant was sentenced to the Indiana State Prison for life. Appellant filed a Motion to Correct Errors which was overruled and this appeal followed.

This appeal presents three issues:

(1) Whether the evidence was sufficient to support the verdict;

(2) Whether the trial court erred in overruling appellant's objection to permitting a State's witness, Robert Gates, to testify when his name was not included on the State's list of witnesses; and

(3) Whether the trial court committed reversible error by failing to instruct the jury concerning appellant's failure to testify.

Appellant makes two major assertions in his argument that the evidence was insufficient. First, the evidence was insufficient to show that appellant started the fire. Secondly, the State failed to establish that Dorothy Gates died in the fire. When reviewing the sufficiency of the evidence, this Court will not weigh the evidence nor determine the credibility of witnesses. Only that evidence most favorable to the State and the reasonable inferences to be drawn therefrom will be considered. As long as there is substantial evidence of probative value sufficient to establish every material element of the crime beyond a reasonable doubt, the verdict will not be disturbed. *Jackson* v. *State* (1971), 257 Ind. 477, 275 N. E. 2d 538.

The evidence most favorable to the State is as follows. At 6:00 p.m. on November 7, 1970, appellant and his wife, Treva Hunt, were drinking in a bar in Indianapolis. Appellant

left his wife at the bar and went home to clean up, returning around 9:00 p.m. At about that time, Dorothy Gates, a live-in baby sitter who cared for the Hunts' child, joined the Hunts. The Hunts' child had been taken to spend the night with friends. The three drank beer until about midnight when Treva and Dorothy went home. Appellant returned home about a half hour later. The three talked for a while and at about 1:30 or 2:00 a.m., Treva and Dorothy went to bed upstairs while appellant went to sleep on the couch downstairs. At about 4:00 a.m., the police came to give aid to a Paul Golay, who was ill. The Hunt's home was double and Mr. Golay lived in the other half. While aiding Mr. Golay, one of the officers heard an argument concerning drinking and money problems, coming from the Hunts' residence. The officer went next door and asked the Hunts to keep it down. The police then left and the Hunts went back to bed.

Later that morning, Treva and Dorothy were awakened by appellant's cries of warning that a fire had been started. Treva and Dorothy were unable to escape by means of the stairs, so they tried to exit out of a window onto the roof over the porch. Treva took Dorothy's hand, but while moving toward the window Dorothy's hand slipped from Treva's hand. Dorothy was a large woman and Treva was unable to help her. Treva continued to the window, kicked out the glass and escaped. Treva Hunt testified that Dorothy did not escape from the fire and was dead when the firemen arrived.

An autopsy was performed on the body of a person identified as Dorothy Gates by her husband, Robert Gates. The doctor who performed the autopsy testified that Dorothy Gates died from smoke inhalation, carbon monoxide poisoning and thermal burns.

One arson investigator who qualified as an expert, started an investigation into the cause of the fire immediately after the flames were extinguished. A window frame in the living room had "rolling blisters" which is caused when moisture is rapidly removed from the wood, indicating a rapid build-up

of heat. Most fires leave small blisters produced when moisture is slowly taken from the wood. Holes with rolled edges were found in an erratic pattern on the floor. A slow burning fire would not cause such holes. "Fire seats" (areas of the origin of a fire) were located at the base and on both sides of the stairway. A fire would only come from both sides of a stairway if some combustible was located in both places. A burning cigarette would not cause such a burn pattern. A sofa in the living room was consumed by the flames to the extent that the springs collapsed. The collapse was so complete the the heat would have to be in excess of 1600°. Such a temperature is caused by a rapidly burning fire where there is a rapid build-up of heat which cannot escape quickly. An average fire such as caused by a dropped cigarette would have a temperature between 700° and 1400°. A blackened can was found in the living room. There was evidence that the can contained an inflammable liquid. This expert was of the opinion that at least two separate fires were started in the house—one in the area of the stairway and another by the couch.

The chief arson investigator for the Indianapolis Fire Department, a qualified expert, also conducted an investigation. He was of the opinion that the fire was started in three separate locations—one by the stairway, one in the doorway between the dining room and kitchen, and one in the living room. He determined that faulty wiring had not caused the fire. An employee of the gas company determined that no gas leaks were present in the lines either inside or outside the house, and that neither the meter nor any of the appliances were defective.

Appellant's neighbor kept a tank of one hundred gallons of fuel oil at the side of his house. The neighbor had heard appellant and his wife argue in the past and appellant told him the day before the fire that he was going to "clean house." A friend of the Hunts testified that she had a conversation with the Hunts in a bar about two weeks after

the fire. Treva Hunt told the witness to watch her step because appellant was aware that she knew appellant had started the fire. The witness turned to appellant and asked him if he had made such a statement. Appellant said, "Yes, you know what I did so you are next on my list."

Appellant contends that this evidence was insufficient to establish that he started the fire. Of course, the evidence is circumstantial, but a person can be convicted strictly on circumstantial evidence. See *Ellis* v. *State* (1969), 252 Ind. 472, 250 N. E. 2d 364. Only three persons were in the house, and only the appellant was downstairs where the fire originated. The fire had a sudden intense heat and started in two or three different locations. A can which had contained an inflammable substance was found in the living room. No one else was seen in or around the house at the time the fire started. It was established that the fire was not caused by a cigarette, faulty wiring, or a gas leak. In addition, appellant admitted to an acquaintance that he had started the fire. Although circumstantial, we hold the evidence is sufficient to show that appellant started the fire.

We find no merit in appellant's second allegation that the State failed to prove that Dorothy Gates died in the fire. Mrs. Hunt testified that she and Dorothy were sleeping upstairs when the fire started and that as they were attempting to escape Dorothy fell. She indicated that Dorothy did not escape from the fire and was dead when the firemen found her. The doctor who performed the autopsy testified that the woman depicted in a photograph, State's Exhibit No. 16, died from smoke inhalation, carbon monoxide poisoning, and thermal burns. Robert Gates testified that the person depicted in State's Exhibit No. 16, and thus the woman upon whom the autopsy was performed, was his wife, Dorothy Gates. This evidence adequately established that Dorothy Gates died in the fire.

Appellant's next contention is that reversible error resulted when Robert Gates, a witness for the State, was permitted

to testify over appellant's objection when Gates had not been included on the State's list of witnesses. The State indicated that it never intended to call Robert Gates as a witness, but did so only because two other witnesses were unable to positively identify the person upon whom the autopsy had been performed as being Dorothy Gates. The trial judge permitted Robert Gates to testify only for that limited purpose.

In such a situation, a defendant's remedy is to seek a continuance if he feels one is necessary. *Luckett* v. *State* (1972), 259 Ind. 174, 284 N. E. 2d 738. Appellant failed to follow that course of action in the case at bar. Appellant cites *Johns* v. *State* (1968), 251 Ind. 172, 240 N. E. 2d 60, for the proposition that permitting witnesses to testify when they have been omitted from the list of witnesses is reversible error. However, the facts in *Johns* are markedly different than are the facts before us. In *Johns,* the evidence indicated an abuse by the State whereas there is nothing to indicate an abuse in the case at bar. *Johns* states that the appropriate remedy is to seek a continuance. It also holds that the State can omit a name from the witness list where it can show a paramount interest in nondisclosure, and the trial court can permit a witness to testify when omitted from the witness list where the State can make a good showing of inability to comply with the order. In the instant case, the State had no intention of using this witness until other witnesses were unable to make a positive identification of the deceased, and the trial court limited the testimony to that matter. Based upon these facts, the State made a good showing of inability to comply. Since the appellant merely objected and did not seek a continuance, he cannot now claim prejudice. The trial court committed no error when it permitted Robert Gates to testify.

Appellant's final allegation is that the trial court committed reversible error by failing to instruct the jury concerning appellant's failure to testify. Appellant relies on IC 1971,

35-1-31-3 (Ind. Ann. Stat. § 9-1603 [1956 Repl.]) which reads in part:

"The following are competent witnesses:

\* \* \*

"Fourth. The defendant, to testify in his own behalf. But if the defendant does not testify, his failure to do so shall not be commented upon or referred to in the argument of the cause, nor commented upon, referred to, or in any manner considered by the jury trying the same; and it shall be the duty of the court, in such case, in its charge, to instruct the jury as to their duty under the provisions of this section."

Appellant claims that since the language of the statute is mandatory, reversible error would arise when the instruction is not given. However, appellant did not submit such an instruction and did not object to the trial court's failure to give the instruction. CR 8 (B) reads:

"The court shall indicate on all instructions, in advance of the argument, those that are to be given and those refused. After the court has indicated the instructions to be given, each party shall have a reasonable opportunity to examine such instructions and to state his specific objections to each, out of the presence of the jury and before argument, or specific written objections to each instruction may be submitted to the court before argument. *No error with respect to the giving of instructions shall be available as a cause for new trial or on appeal, except upon the specific objections made as above required.*" (our emphasis)

See *Felton* v. *State* (1894), 139 Ind. 531, 39 N. E. 228; *Barker* v. *State* (1958), 238 Ind. 271, 150 N. E. 2d 680; *Summerlin* v. *State* (1971), 256 Ind. 652, 271 N. E. 2d 411. Since appellant did not object to the failure to give such instruction and failed to tender an instruction on the subject, he cannot now complain.

For all the foregoing reasons, the judgment of the trial court is affirmed.

Judgment affirmed.

Arterburn, C.J., DeBruler, Givan and Prentice, JJ., concur.

NOTE.—Reported in 296 N. E. 2d 116.